## BURDETT and another *v.* WILLIAMS and another.[1]

*(District Court, D. Connecticut. March 22, 1886.)*

1. SEAMEN'S WAGES—WHALING VOYAGE—ACTS JUNE 9, 1874, AND JUNE 20, 1790, §§ 4520, 4568, REV. ST., CONSTRUED—FAILURE TO DELIVER ENTIRE CARGO—DEVIATION AND DELAY, WHEN JUSTIFIABLE — CONSTRUCTION OF SHIPPING ARTICLES.

   The libelants signed shipping articles which were partly written and partly printed. The printed part of the paper was the usual "whalemen's shipping paper," and described the voyage as a "whaling voyage from the port of New London to Cumberland inlet and elsewhere." The seamen's wages were called "shares of the net proceeds." The written part of the contract was as follows: "It is also further understood and agreed that we are to receive monthly wages as set opposite our names, in lieu of our lays in freight earnings, from the time that the said schooner leaves the port of New London until all freights are discharged, and all freight is taken on board at A., C., and N. If, on taking on board all freights at above-named stations, the vessel has not sufficient quantity, say from six to seven hundred barrels, then our wages are to cease, and we are to stop to whale at N. or elsewhere, and receive the lays set opposite our names on all catchings taken after such date in lieu of wages: but if the quantity taken on board is sufficient to come home, then our wages are to continue until arrival of vessel at New London, fall of 1884." *Held* that, by the terms of the contract, monthly wages were to be paid in lieu of a lay in freight earnings, and if the vessel got enough freight to fill her, monthly wages were to be paid continuously, and the vessel was to return in the fall of 1884. If a sufficient quantity of freight was not received, whaling was to begin, and monthly wages were to cease; and, from the surrounding circumstances, it also appeared that no contract was made that the whaling voyage should cease in the fall of 1884.

2. SAME—ACT OF 1874—REV. ST. § 4520.

   The shipping articles were not void for non-compliance with the shipping commissioners' act, which, by the act of June 9, 1874, do not apply to vessels in the trade between the United States and the British North American possessions, or in any case where the seamen are entitled to participate in the result of a voyage. The shipping agreement was not in violation of section 4520, Rev. St.

3. SAME—DEVIATION—SHORT ALLOWANCE OF PROVISIONS—MONTHLY WAGES.

   After the delivery of freight had ceased, and whaling had commenced, the vessel and crew, on account of stress of weather, and not by the negligence of the captain, were compelled to winter in Davis straits, and did not return till the fall of 1885. Meanwhile, they shared their 17 months' supply of provisions with a shipwrecked crew. Provisions grew scarce, and for a time they were on short allowance. The voyage was unsuccessful. No catchings were to be divided, and the libelants returned penniless. There was a deviation to St. Johns, Newfoundland, to land the shipwrecked crew, and to refit. *Held*, that the crew were not entitled to monthly wages, or to extra wages on account of short allowance of provisions, they having been diminished by delivery to a crew in distress, without the fault of the respondents. *Held, also*, that the circumstance that the respondents were unable, without peril to life, to deliver at Cumberland inlet a small and immaterial part of the cargo, could not be taken advantage of by the libelants as a ground for extending the period wherein monthly wages were due.

In Admiralty.

*Thomas A. Codd* and *E. L. Barney*, for libelants.

[1] Reported by Theodore M. Etting, Esq., of the Philadelphia bar.

*Samuel Park*, for respondents.

SHIPMAN, J. This is a libel *in personam*, claiming seaman's wages, and damages for short allowance of food, and for an unnecessary and wrongful detention for nearly 10 months in the waters of British North America. Francis H. Yon, Thomas J. Kelly, and Isaac D. Sampson have, by petition, become co-libelants since the libel was filed. The facts in the case are as follows:

In the spring of 1884 the respondents, C. A. Williams & Co., were the owners of two whaling vessels, the Roswell King and the Lizzie P. Simmons, which were then on whaling voyages upon the east coast of British North America. The King had been there two years. Neither vessel had been heard from for 18 months, and neither was expected to return home during that season. The respondents were also owners of the whaling schooner Era, and during that spring fitted her out thoroughly, with 17 months' provisions for 23 men, with a whaling equipment, with provisions and stores for the Roswell King, and with two casks containing whaling lines, an anchor, rigging, and sail for the Simmons. The object of the voyage was to carry the above-named freight to the two vessels, and to bring home whatever oil and bone they had. If not enough freight was received from them to fill the schooner, which would take 600 or 700 barrels, then the Era was to remain upon a whaling voyage.

Early in June, 1884, John O. Spicer, one of the respondents, with the captain, Timothy F. Clisby, and the second mate, shipped a crew at New Bedford for the voyage of the Era. Each one of the officers and crew intelligently signed a partly printed and partly written shipping paper or contract. The printed part of the paper was the usual "whalemen's shipping paper," and described the voyage as a "whaling voyage from the port of New London to Cumberland inlet and elsewhere." The seamen's wages were called "shares of the net proceeds." The written part of the contract was as follows:

"It is also further understood and agreed that we are to receive monthly wages as set opposite our names, in lieu of our lays in freight earnings, from the time the said schooner leaves the port of New London until all freights are discharged, and all freight is taken on board at stations Arkolea, Cumberland inlet, and New Guneuke. If, on taking aboard all freights at the above-named stations, the vessel has not sufficient quantity, say from six to seven hundred barrels, then our wages are to cease, and we are to stop to whale at New Guneuke or elsewhere, and receive the lays set opposite our names on all catchings taken after such date in lieu of wages; but if the quantity taken on board is sufficient to come home, then our wages are to continue until arrival of vessel at New London, fall of 1884."

This contract was explained to, and was understood by, each of the crew. Monthly wages were to be paid in lieu of the lay in freight earnings, and if the vessel got sufficient freight to fill her, monthly wages were to be paid continuously, and the vessel was to return forthwith in the fall of 1884. If a sufficient quantity of freight was not

received, whaling was to begin, and thereafter monthly wages were to cease. If whaling commenced, it was undoubtedly the hope or expectation of both owners and crew that the voyage would end in six months, but from the provisioning of the vessel for 17 months, her equipment as a whaler, and the well-known uncertainties of the whale fishery, it is manifest that no contract was made that the whaling voyage should cease in the fall of 1884. The number of the crew, and the equipment of the vessel, plainly showed that whaling was one of the intended objects of the voyage; and if the voyage was for whaling, it is not easy to believe that there was any agreement or understanding that it must end in six months. It would have in fact ended in that time if the vessel had not been caught by such stress of weather that she was compelled to winter.

The Era left New London on June 10, 1884, and reached Hudson straits in July, 1884, where she was jammed in the ice, and delayed 20 to 25 days. She reached Arkillie about August 28, 1884, and found the Roswell King and a crew of 23 men belonging to the shipwrecked schooner Isabella, who were being fed by the Roswell King. The Era discharged all the freight that was destined for the King, took on board her cargo, consisting of 118 barrels of oil, between 1,400 and 1,500 pounds of bone, and some skins, the crew of the Isabella, and two of the King's crew, and started on September 9th for the Simmons, at Cumberland inlet, 450 or 500 miles by water from Arkillie. There was a head wind, and at the request of the Isabella's captain her crew were put ashore at New Guneuke on September 15th. A tent was built, and provisions were left for them. The Era was delayed somewhat by bad weather, and started again for Cumberland inlet on September 24th, and three times got within 40 miles of her destination and was blown back. The ice was 18 inches thick upon her deck. The captain consulted with his officers, and all agreed that if he undertook to keep on his course the vessel would be unmanageable. The Era turned back, reached New Guneuke on October 4, 1884, and commenced whaling on the same day, when monthly wages stopped. Three boats were fitted out for whaling. All were unsuccessful, and the captain returned on October 24th, and started to go home on the same day, with the Isabella's crew on board, when he decided, upon consultation with the Isabella's officers and his own, that it was unsafe to attempt leaving the harbor. He concluded, from examination, that the heavy pack ice had commenced to come down the straits, and to shut in, and, if so, that he could probably never return to his harbor. In this opinion the captain of the Isabella concurred. No one contradicts the wisdom of this conclusion. The objection which is made to the captain's course is that he was negligent, and ought to have known earlier that the ice was filling the straits, and ought not to have been caught.

Upon the evidence, there can be no affirmative finding of negligence. The next winter the Era left her anchorage October 28th,

and Capt. Spicer had left in different years on November 4th, 6th, and 7th, and found no pack. Capt. Clisby has been master of the Era twice, and of the King once; has made five voyages to British North America; and was caught in the ice, and wintered there the winter of 1883–84. When the desirableness of avoiding an Arctic winter; the burdensome necessity, if the Era remained, of feeding the Isabella's crew; the fact that apparently winter set in earlier at this season than was usual; and the fact that no witness can charge negligence,—are all considered, the only finding that I can properly make from the evidence is that the vessel was detained by stress of weather, without the fault of the captain.

The vessel was put in readiness for the winter as well as they were able. An account of the provisions on hand was taken, and the men were told that they could have a navy ration, or could have what the captain thought best, as they preferred. They decided to take what the captain thought best. The provisions grew scarce, for double the expected number were to be fed. On December 2d the captain sent a dog team, with natives, to the Simmons to obtain provisions. None were obtained. On June 28th meat was scarce, and after July 31st the rations were cut down one-half. There was no positive distress on account of lack of food. The natives, as is usual, came in numbers, killed seal, walrus, and deer, brought the meat, and, in July, 1885, duck's eggs, and received some of the Era's provisions, but brought more than they received. Yon, the cook, had the scurvy very badly, and is now a permanent cripple, as a result. He was imprudent in not taking preventives. Others had also the same disease. The captain properly insisted upon the sailors using raw seal meat and blood, which it is necessary to take, in that climate, as a preventive and cure for the scurvy. The crew suffered from cold and from the melting frost trickling into and wetting their berths, and from all the discomforts of an Arctic winter. They were warmly clad, and could always obtain a sufficiency of warm clothing. Native women were on the vessel, cleaning the skins of the animals which were killed, and preparing them for clothing. Capt. Spicer, who has been sailing in the Arctic regions since 1856, testified that it is possible for a man to live there in the winter without skin clothing, but it is not practicable.

When the natives returned, on December 25, 1884, from the Simmons, they reported that she had 100 barrels of seal oil and the bone of a small whale. The whaling season in that latitude is from May to November 1st. Capt. Clisby commenced whaling on May 7th. No whales were caught. The season for leaving the straits in safety is from August to November. The Era left its harbor on August 7, 1885, for St. Johns, Newfoundland, to land the shipwrecked crew, to refit, and return; and reached St. Johns on August 24th. Upon the voyage, the captain bought supplies from a passing vessel. At St. Johns the crew of the Isabella was left. Yon, the cook, and the boat steerer, who was also sick, were sent home. Two men deserted, and many of

the others were exceedingly unwilling to return to Davis straits, and were mutinous. All finally went with the vessel except the four who have been mentioned.

The Era sailed from St. Johns on September 16th, and reached Davis straits about October 1st. Whaling was unsuccessfully attempted till October 28th, when she sailed for home, and reached New London on November 26th with no catchings. The libelants had more than exhausted the monthly wages allowed till October 4th in advances, and supplies from the slop-chest. Each was given enough money to reach New Bedford, and receipts were signed by each except by Yon. It thus appears that the libelants returned penniless after an absence of 17½ months, and the privations of an Arctic winter of between 9 and 10 months. The unfortunate character and result of the voyage naturally incline a court to look favorably upon their case, and to desire to give them an allowance, if it can properly be done.

The theory of the libel is that each sailor had, by the terms of the contract, monthly wages and a lay; that the vessel could have returned in December, 1884, as was contemplated when she left New London; that, in violation of the shipping agreement, the captain remained in northern waters, and the crew were put upon short allowance, and suffered from cold; and that from St. Johns the captain returned to British North America against the will of the libelants, and by fraud and deception. The libelants also insisted upon the trial that the voyage was a freighting voyage; that the shipping articles were not in accordance with the statute, were void, and that, therefore, the seamen could recover the highest rate of wages; that the freight not having been entirely delivered, the men were continuously entitled to monthly wages, and the captain had no right to commence whaling; but, if he did commence, the men should be recompensed for his negligence in being caught in the ice, and thereby being placed upon short allowance.

By the act of June 9, 1874, (1 Supp. Rev. St. 31,) none of the provisions of the shipping commissioners' act of 1872 apply to vessels in the trade between the United States and the British North American possessions, or in any case where the seamen are entitled to participate in the results of a voyage. The shipping articles were not void for any non-compliance with the shipping commissioners' act. Neither was the shipping agreement in violation of section 4520, which requires the agreement to specify the voyage or term of time for which the seamen are shipped. It was known and understood by owners and crew that the voyage was to be a whaling voyage if a full freight was not found. The time when the freighting voyage was to end was stated. From the fact that a whaling voyage is not from port to port, it has never been supposed that this section, which was a part of the act of July 20, 1790, (1 St. at Large, 131,) applied to whaling voyages. 3 Kent, Comm. 179; *The Atlantic,* Abb. Adm. 451; *Taber* v. *U. S.,* 1 Story, 1.

The point that because the freight for the Simmons was not discharged, therefore the voyage continued to be upon monthly wages, is a very technical one. There were but two hogsheads for the Simmons, and the most vigorous attempts were made to reach her, and were only abandoned on account of absolute necessity. Whatever may be said of Capt. Clisby's imprudence in not trying to reach a home port sooner, he cannot be charged with a lack of courage. He did all, and perhaps more, than was prudent in trying to deliver his freight at Cumberland inlet. It would be a most extreme and an unjust technicality to hold that the delivery of two hogsheads having been necessarily and wisely abandoned on account of peril to life on board the Era if the attempt to deliver them was prolonged, nevertheless the voyage continued to be a freighting voyage until its termination.

No wages are due to the libelants in consequence of the detention at New Guneuke till August, 1885, or on account of short allowance of provisions. The detention, and the consequent privations of the men, occurred from stress of weather, and not from design, willfulness, or negligence. The calamity was incident to navigation in those waters, and was a contingency which must be well understood by those who enter upon a voyage to the whaling region of British North America. The short allowance was due to the delivery of a part of the provisions to a crew in distress. If an ample supply of provisions was taken at the begining of the voyage, and it became diminished by delivery to a crew in distress, without the fault of the captain or owners, they not having become bound by contract or agreement to continuously furnish a stipulated amount of provisions, the owners are not bound to pay extra wages for such short allowance. No agreement or contract having been entered into in regard to a continuous supply of food, section 4568 of the Revised Statutes does not seem to be applicable to the case. The decisions under the ninth section of the act of July 20, 1790, are instructive upon this part of the case. 2 Pars. Shipp. & Adm. 76.

The decision of Capt. Clisby to go to St. Johns, and to return, rather than to proceed to New London, turned out to be an unfortunate one, and the remaining question is whether the libelants ought to have compensation for the time spent after September 16th. In the contingency of not finding sufficient freight, the voyage was to be for whaling. Whaling voyages to the northern seas, if one winter is spent there, occupy the next brief summer. The equipment indicated that the contingency was in the minds of the owners when they spent their money in fitting out the vessel. Only upon this plan, in the event that the winter was spent in the ice, could there be any chance of profit to owners or crew. The whaling season commenced in May, and would ordinarily continue until November. If the Era had not been obliged to get rid of the shipwrecked crew, and to supply herself with provisions as soon as the weather permitted her to leave Davis straits, a stay until the middle or the last of Oc-

tober would have been the natural course. The voyage to St. Johns to leave the Isabella's crew, and to refit, was a proper and not a voluntary deviation. "The seaman is bound to the vessel, so long as she continues on the *iter;* and her being driven from a direct course, or going voluntarily off it for shelter or repair, in no way relieves him from his contract." *Miller* v. *Kelly*, Abb. Adm. 564.

Let there be a decree dismissing the libel, without costs.